Filed 11/2/22  Scheiber Ranch Properties v. City of Lincoln CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| SCHEIBER RANCH PROPERTIES, LP, et al., | |
| Plaintiffs and Appellants, | C092083 |
| v. | (Super. Ct. No. SCV0040629) |
| CITY OF LINCOLN, | |
| Defendant and Respondent; | |
| RICHLAND DEVELOPERS, INC., | |
| Real Party in Interest and Appellant. | |

Scheiber Ranch Properties, LP and Albert Scheiber (collectively Scheiber Ranch) filed a petition for writ of mandate challenging the decision of the City of Lincoln (Lincoln) to certify an environmental impact report (EIR) under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) and to issue land use approvals for the Village 5 project by Richland Developers, Inc. (Richland).[1] Scheiber Ranch subsequently amended its writ petition to add a complaint for deprivation of substantive due process and uncompensated taking against Lincoln.

---

[1] Undesignated statutory references are to the Public Resources Code.

The trial court granted the writ petition as to the EIR discussion for the Village 5 Specific Plan (the Specific Plan) relating to transit impacts and mitigation measures that relied on compliance with the Placer County Conservation Program (the Conservation Program). It denied the writ petition as to the remainder of Scheiber Ranch's claims. The trial court sustained without leave to amend a demurrer to the causes of action for deprivation of substantive due process and uncompensated taking.

Scheiber Ranch now contends (1) the EIR fails to adequately disclose agricultural resource impacts and fails to mitigate to the extent feasible, referencing mitigation measure 3.2-1, (2) the EIR does not adequately inform on water supply, (3) the EIR fails to provide adequate information about its fair-share mitigation to determine effectiveness, (4) the EIR impermissibly defers analysis and mitigation regarding impacts to biological resources, i.e., mitigation measure 3.4-2(b) is inadequate, (5) the trial court erred in ordering only partial decertification of the EIR and declining to vacate the project pending Lincoln's additional CEQA review, (6) Scheiber Ranch asserted a cognizable substantive due process claim, and (7) the trial court erred in sustaining without leave to amend the demurrer to the uncompensated taking cause of action.

In its cross-appeal, Richland contends (8) the Scheiber Ranch challenge to mitigation measure 3.2-1 is moot, (9) the trial court erred in concluding that certain mitigation measures were improperly deferred, and (10) the trial court erred in ruling that the EIR's analysis of transit impacts violated CEQA.

We conclude Scheiber Ranch fails to demonstrate that the EIR's discussion of impacts on agricultural resources and mitigation, water supply, or fair-share mitigation is deficient. However, mitigation measure 3.4-2(b) improperly deferred the formulation of mitigation measures for potentially significant adverse impacts on the habitat of special-status species.

We further conclude that a trial court may order a partial decertification of an EIR and suspend only those parts of the project that do not comply with CEQA upon making

2

requisite severance findings; that Scheiber Ranch has not established error in the trial court's demurrer rulings; and that the approval of the final Conservation Program did not moot Scheiber Ranch's claims.

But we agree with the trial court that the EIR's discussion of mitigation measures requiring compliance with the Conservation Program is inadequate. And Richland fails to demonstrate that the EIR's discussion of transit impacts complied with CEQA.

We will reverse the judgment with regard to mitigation measure 3.4-2(b) and direct the trial court to enter a judgment and issue a writ of mandate consistent with this opinion. We will affirm the judgment in all other respects.

BACKGROUND

The Specific Plan contemplated the annexation of approximately 4,787 acres into Lincoln and the development of that property to create approximately 8,200 residential dwelling units, 4.6 million square feet of commercial space, and public/semipublic facilities, including a high school, a junior high school, three elementary schools, parks, and open space. It was anticipated that development would occur over a 15- to 25-year period. The Specific Plan area would be developed separately and at different times because it was owned by different landowners. Richland owned and/or controlled about 1,541 acres of the Specific Plan area. The EIR provided a project-level analysis for Area A of the Specific Plan area and a program-level analysis for Areas B through J.

Scheiber Ranch Properties, LP owned and operated agricultural land within the Specific Plan area. Albert Scheiber was a general partner of Scheiber Ranch Properties, LP. Scheiber Ranch filed a petition for writ of mandate pursuant to CEQA to set aside Lincoln's certification of the EIR for the Specific Plan. It subsequently filed a second amended petition for writ of mandate and complaint for declaratory and injunctive relief, adding causes of action for deprivation of substantive due process and uncompensated taking.

3

Following a hearing, the trial court granted the second amended writ petition in part and denied it in part. It sustained without leave to amend the demurrer to the deprivation of substantive due process and uncompensated taking causes of action. In addition, the trial court made findings pursuant to section 21168.9, subdivision (b) and concluded that the portions of the EIR that did not comply with CEQA -- i.e., the discussion of impacts on transit and reliance on the Conservation Program as mitigation for impacts to biological and agricultural resources -- were severable from the remaining Specific Plan approvals. Accordingly, it issued a peremptory writ of mandate requiring Lincoln to decertify those portions of the EIR that addressed reliance on the Conservation Program as mitigation and impacts on transit and to suspend the same parts of the Findings of Fact and Statement of Overriding Considerations. The writ required Lincoln to bring the EIR into compliance with CEQA and precluded Lincoln from issuing grading permits, allowing construction to start, or allowing any Specific Plan activity to occur that could result in an adverse change to the environment until it had complied with the writ.

STANDARD OF REVIEW

The standard of review in a CEQA case is abuse of discretion. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) But we determine de novo whether the EIR's discussion of environmental impacts, alternatives, or other required information is adequate, that is, whether the discussion is " ' " 'sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' " (*Id.* at p. 516, see *id.* at pp. 513-516.) In doing so, we keep in mind that our role is to determine whether the EIR is sufficient as an informational document, not whether the agency's conclusions are correct. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights Improvement Assn.*).) And we review the agency's factual determinations -- e.g., challenges to the scope of the EIR's analysis of a topic, the

4

methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied -- for substantial evidence. (*Sierra Club,* at p. 516; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*); *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1296 (*Habitat & Watershed Caretakers*).) Under that standard, we accord deference to Lincoln's substantive factual conclusions, we do not set aside its determination on the ground that an opposite conclusion would have been equally or more reasonable, we do not reweigh conflicting evidence, and we resolve reasonable doubts in favor of Lincoln's findings and decision. (*Sierra Club,* at p. 512; *Berkeley Keep Jets Over the Bay Committee v. Board of Port Commissioner* (2001) 91 Cal.App.4th 1344, 1356.) We presume the challenged EIR is adequate, and the party challenging the EIR bears the burden of proving it is inadequate or that insufficient evidence supports one or more of its conclusions. (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924-925 (*Rialto*).)

DISCUSSION

SCHEIBER RANCH'S APPEAL

I

Scheiber Ranch contends the EIR fails to adequately disclose agricultural resource impacts and fails to mitigate to the extent feasible, referencing mitigation measure 3.2-1.

A

Scheiber Ranch challenges the EIR's discussion of the Specific Plan's impacts on land subject to Williamson Act contracts. It contends the urban land uses contemplated under the Specific Plan were not allowed under Williamson Act contracts, but the EIR dismissed such impact.

To preserve agricultural and open space land and discourage premature urban development, the California Land Conservation Act of 1965 (Gov. Code, § 51200 et seq.), also known as the Williamson Act, authorizes local governments to establish

5

agricultural preserves and enter into contracts with landowners to limit land within a designated preserve to agricultural and compatible uses for the duration of the contract. (*County of Humboldt v. McKee* (2008) 165 Cal.App.4th 1476, 1487-1488.)  In return, " 'the landowner is guaranteed a relatively stable tax base, founded on the value of the land for open space use only and unaffected by its development potential.' " (*Id.* at p. 1488.)  Each contract between the landowner and local government has an initial term of at least 10 years and provides for automatic annual renewals thereafter unless notice of nonrenewal is given as provided in the statute. (*Id.* at p. 1489.)  A contract may be terminated at any time by giving the required notice, but the land use restrictions in the existing contract remain in effect for the balance of the contract term. (Gov. Code, § 51092; *County of Humboldt,* at p. 1489.)

The EIR described Williamson Act contracts and acknowledged that the Specific Plan area included 987.08 acres that were subject to active Williamson Act contracts, plus 302.27 acres that had started the nonrenewal process under the Williamson Act. The EIR stated that land subject to a Williamson Act contract could not be developed under the Specific Plan until the land was no longer subject to a Williamson Act contract. It explained that the General Development Plan for the Specific Plan prohibited the development of land under an active Williamson Act contract. The EIR concluded that because land under a Williamson Act contract would not be developed until the contract was cancelled and because all agricultural uses existing at the time of annexation would be permitted under the General Development Plan's Agricultural Overlay District, implementation of the Specific Plan would not conflict with Williamson Act contracts. The Agricultural Overlay District would allow agricultural uses that were in existence prior to adoption of the Specific Plan to continue until the land is developed for urban uses under the Specific Plan. As a result, the EIR determined that the impact on Williamson Act lands would be less than significant and no mitigation was required.

Scheiber Ranch claims the Specific Plan would result in a significant impact because its proposed land uses conflict with the permitted land uses under Williamson Act contracts. However, as the EIR makes clear, a project applicant could not develop land subject to an active Williamson Act contract. Lincoln reiterated in response to comments to the draft EIR that existing Williamson Act contracts would remain in effect until nonrenewed or cancelled and no development may occur on Williamson Act property unless and until any applicable Williamson Act contract was no longer in effect. Responses to comments to a draft EIR are part of the EIR. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 516-517.) Scheiber Ranch fails to demonstrate that the EIR improperly dismissed the Specific Plan's impact on land subject to Williamson Act contracts.

We also reject Scheiber Ranch's contention that the EIR violates CEQA because its baseline did not include existing Williamson Act contracts. Environmental baseline refers to the physical and environmental conditions at the site of the proposed project. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 248 (*Center for Biological Diversity*).) Typically, the baseline for environmental analysis is the existing conditions of the environment at time the environmental analysis is performed. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 445, 455; *Center for Biological Diversity,* at p. 249.) The EIR acknowledged that the existing environmental setting included active Williamson Act contracts.

Citing a June 20, 2014 memorandum from Maywan Krach of the Placer County Community Development Resource Agency Environmental Coordination Services, Scheiber Ranch claims Placer County agreed with Scheiber Ranch's interpretation as to whether a conflict with existing Williamson Act contracts might occur. This is incorrect. The memorandum responded to the Notice of Preparation for the Specific Plan. The draft

7

EIR was completed in 2016 and the Krach memorandum did not evaluate whether the Specific Plan potentially impacted Williamson Act contracts.

B

Scheiber Ranch also contends Lincoln failed to support its decision to layer agricultural and biological resources mitigation, and mitigation measure 3.2-1(b) incorrectly treated habitat and farmland as interchangeable. The arguments lack merit.

We review an agency's exercise of discretion in selecting the methodology to be used in evaluating an environmental impact for substantial evidence. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 337.) "The issue is not whether other methods might have been used, but whether the agency relied on evidence that a ' "reasonable mind might accept as sufficient to support the conclusion reached" ' in the EIR." (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 642.)

The EIR explained that impacts to agricultural land and biological resources could be addressed concurrently because land used for active agricultural production could also provide habitat for sensitive species. It indicated that grazing was the primary agricultural activity in the Specific Plan area, and grassland and rice fields made up the highest acreage in the Specific Plan area. The EIR also described the habitats found in grassland and rice fields and the various animal species that inhabit and/or forage in those habitats. In response to a comment that the EIR failed to explain why it was necessary to mitigate for agricultural land loss simultaneously with biological impacts, Lincoln said: "As vast amounts of habitat types still present within the Plan Area consists [*sic*] of agricultural land, much of which is occupied by [Conservation Program] Covered Species, it [is] not possible [to] separate the biological and ecological value of remaining farmland from the more naturalized tracts of land still present within the County. As part of assembling a County-wide preserve with value to the Covered Species, it is an integral part of the [Conservation Program] to combine remaining natural lands with the open

8

space associated with farmland." The EIR contained an adequate explanation for Lincoln's decision to use mitigation measure 3.4-1 and 3.4-2, which related to biological impacts, as mitigation for impacts on agricultural resources.

Scheiber Ranch nevertheless urges that the EIR did not explain how the Specific Plan's impacts on agricultural resources would be mitigated using the same mitigation measures for impacts on biological resources. We disagree.

In its discussion of mitigation measure 3.4-1, the EIR explained that the approximately 715 acres of land Richland had acquired to mitigate impacts on habitat in Area A were currently used as grassland/pasture and fallow/idle cropland with some areas used to grow winter wheat, hay/non-alfalfa and other crops, showing some connection between mitigation of biological impacts and the preservation of land used for agricultural production. If the Conservation Program was not adopted and approved by Placer County and Lincoln, mitigation measure 3.4-2 required that 1.35 acres of land be conserved in perpetuity for every 1.0 acre of land cover impacted. Conservation easements and management plans must provide for "long-term maintenance of biological functions and values" and, whenever feasible, compatible agricultural use. Mitigation measure 3.4-2 would, thus, help preserve agricultural land. Scheiber Ranch claims the EIR ignored a majority of agricultural types, but the EIR discusses grasslands and rice fields which made up the majority (over 90 percent) of the existing land in the Specific Plan area.

Scheiber Ranch also asserts that Lincoln failed to adopt all feasible mitigation measures to address the impact of converting farmland to non-agricultural uses.

When an EIR identifies significant effects on the environment that would occur if a project is approved or carried out, the EIR must describe feasible measures that could minimize the significant effects. (§ 21100, subd. (b)(3); Guidelines, § 15126.4,

9

subd. (a)(1);[2] see § 21081, subd. (a); Guidelines, § 15091, subd. (a); *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 433.) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364.) "Where several measures are available to mitigate an impact, each should be discussed and the basis for selecting a particular measure should be identified." (Guidelines, § 15126.4, subd. (a)(1)(B).)

Scheiber Ranch says it suggested several mitigation strategies other than conservation easements during the public review process but Lincoln rejected those suggestions without analyzing their feasibility. The comment Scheiber Ranch references was submitted long after the public review period had ended. Comments about the environmental effects of a project must be made to lead agencies as soon as possible in the review of environmental documents so that lead agencies may identify, at the earliest possible time in the environmental review process, potential significant effects of a project, alternatives, and mitigation measures that would substantially reduce the effects. (§ 21003.1.) Lincoln was not required to respond to late comments. (§§ 21091, subd. (d)(1), 21092.5, subd. (c); *Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 852, fn. 9; *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1110 (*Gray*).)

In any event, we do not conclude from the record that the suggested measures to help maintain farming were mitigation measures Lincoln should have considered. Full

---

[2] All references to Guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). The Guidelines help public agencies implement CEQA and are binding on them. (§ 21083, subds. (a), (e); Guidelines, § 15000.) We accord the Guidelines great weight in interpreting CEQA, except where they are clearly unauthorized or erroneous, a claim no party makes here. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 217, fn. 4.)

buildout under the Specific Plan would lead to the development of over 8,000 dwelling units, millions of square feet of "employment-generating and commercial land uses," along with recreational, open space, public and educational land uses. Nothing in the record shows that measures aimed at maintaining farming would be feasible where the Specific Plan contemplated the development of farmland for non-agricultural uses. The EIR stated that where an impact was determined to be significant or potentially significant, mitigation measures were identified, where appropriate and feasible. A reasonable inference from this statement is that the EIR identified all feasible mitigation measures. (See *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 868 (*King & Gardiner Farms, LLC*).) Scheiber Ranch fails to show that Lincoln did not consider all feasible mitigation measures for the Specific Plan's impacts on agricultural resources.

In its appellate reply brief, Scheiber Ranch contends that substituting agricultural land with "any natural community" is inadequate mitigation. We do not consider the claim because it was raised for the first time in the reply brief without a showing of good cause. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765.)

II

Scheiber Ranch next argues the EIR does not adequately inform on water supply, i.e., that the EIR's analysis of impacts related to providing water to the proposed project is deficient. It contends the EIR should have identified the nature of Lincoln's rights, if any, to pump groundwater. We reject this claim.

The EIR explained that the Specific Plan area was above the North American Subbasin of the Sacramento Valley Groundwater Basin. It stated that "the [North American] Subbasin [had] not been the subject of any proceeding to adjudicate rights to pump groundwater." Contrary to the claim by Scheiber Ranch, *Vineyard, supra*, 40 Cal.4th 412, and *King & Gardiner Farms, supra*, 45 Cal.App.5th 814, did not hold that

11

an EIR must disclose the nature of the legal rights and entitlements to groundwater at the time of project approval.  Future water supplies identified and analyzed in the EIR must bear a likelihood of actually proving available.  (*Vineyard,* at p. 432.)  However, an EIR need not demonstrate that the supply of water is assured through signed, enforceable agreements with a provider and already built or approved facilities.  (*Ibid.*)

The EIR showed there was a likely and reliable source of groundwater for the Specific Plan.  The EIR stated, based on information from Lincoln's 2015 Urban Water Management Plan, that groundwater levels throughout Western Placer County had been relatively stable for 25 years.[3]  The Water Supply Assessment for the Specific Plan (Water Supply Assessment) likewise stated that Lincoln's Groundwater Management Plan and the Western Placer County Groundwater Management Plan indicated that groundwater conditions underlying Lincoln and its sphere of influence showed currently and historically stable groundwater elevations and reliable water quality.[4]  Accordingly,

---

[3]  The EIR explained that the California Water Code required public water suppliers to prepare an urban water management plan, a water supply planning document that often formed the basis of water study assessments prepared for individual projects.  Lincoln adopted its 2015 Urban Water Management Plan in August 2016.

[4]  The EIR explained that section 21151.9 required a water supply assessment to be prepared for certain projects to ensure that long term water supplies were sufficient to meet a project's demands in normal, single dry and multiple dry years for a period of 20 years.  The EIR stated that completion of a water supply assessment required collection of proposed water supply data, an evaluation of existing use, a projection of anticipated demand sufficient to serve the project for a period of at least 20 years, delineation of proposed water supply sources, and an evaluation of water supply sufficiency under single year and multiple year drought conditions.  The Water Supply Assessment for the Specific Plan was attached as Appendix H to the draft EIR.

The EIR further stated that Lincoln adopted a Groundwater Management Plan in 2003 to "(1) augment the overall water supply through conjunctive use and other means, (2) project groundwater quality, (3) implement a groundwater monitoring program, and (4) develop a public participation program."  The Western Placer County Groundwater

12

the Water Supply Assessment concluded there was a reliable supply of groundwater for the Specific Plan. Table 3.16-6 of the draft EIR showed the projected baseline water demand and water supply for Lincoln and the Specific Plan under normal, single, and multi-year conditions from 2020 to 2040. The chart showed a more than sufficient water supply for Lincoln and the Specific Plan. Further, the EIR stated that as urbanization occurred in and around Western Placer County and Lincoln, annual groundwater pumping from the North American Subbasin was not anticipated to change significantly from existing quantities because (1) the availability of surface water supplies from the Placer County Water Agency and Nevada Irrigation District would continue to limit reliance on groundwater to meet water demands; (2) the increase in groundwater pumping as urbanization occurred would likely be more than offset by the reduction in groundwater pumping by private agricultural users; and (3) efforts by partners of the Western Placer County Groundwater Management Plan would help maintain sustainable groundwater resources in Western Placer County. The EIR explained how the Specific Plan would reduce groundwater use for irrigated crops within Lincoln's sphere of influence. In response to comments, Lincoln explained that conversion from agricultural to municipal use in the Specific Plan area would conserve at least two acre-feet per acre of water and a portion of the project water would be discharged back into Auburn Ravine, helping recharge the groundwater in that area. The EIR concluded that the North American Subbasin was expected to continue to sustainably provide for the supplemental groundwater needs of Lincoln. Substantial evidence in the draft EIR supported that conclusion.

_____

Management Plan was developed by Lincoln, the Placer County Water Agency and the City of Roseville to maintain a safe, sustainable and high quality groundwater resource within the North American Groundwater Subbasin. Lincoln adopted the Western Placer County Groundwater Management Plan in 2007. A copy of the Plan was attached to the Water Supply Assessment for the Specific Plan.

13

Scheiber Ranch next contends that the EIR did not adequately analyze whether the planned use of groundwater may result in overdrafting the local basin. Scheiber Ranch says Lincoln pumped 2,686 acre feet of groundwater in 2011, causing the local groundwater basin to go into overdraft condition.

The EIR quoted an internal memorandum about groundwater conditions in the area of Lincoln, drafted in support of Lincoln's Water Supply Master Plan and 2015 Urban Water Management Plan update: "Groundwater conditions in and around [Lincoln] appear, in spite of the severe drought, relatively stable. The basin elevations have not seen significant long-term decline and in some cases have shown some recovery. Groundwater elevations have seen increased seasonal variability in some wells and decreased in others but the natural recharge has been sufficient to refill the basin in and around [Lincoln]. This indicates that the basin in and around [Lincoln] is operating within its safe yield. Although basin decline was caused by the 2011 canal failure and resulting emergency pumping, the basin was able to completely refill with no apparent long-term effects in the [Lincoln] area. This indicates that the 2011 pumping may have been above the area's safe yield, but did not cause a permanent decline in groundwater capacity. Unbroken periods of well records are difficult to locate in the area of this review but neighboring wells with new and old data show consistent elevations." Scheiber Ranch concludes from this quote that the local groundwater basin went into an overdraft condition in 2011. But Appendix F of the Water Supply Assessment stated that, based on Department of Water Resources documentation, groundwater elevations directly underlying Lincoln were not in a long-term state of decline. According to the analysis in Appendix F of the Water Supply Assessment, groundwater elevation data supported the conclusion that groundwater elevations were not declining within the vicinity of Lincoln. And we found nothing in the EIR stating that groundwater elevations underlying Lincoln were in an overdraft condition in 2011 or any other year.

14

Citing the internal memorandum, Scheiber Ranch concludes that the projected groundwater pumping for the years 2025 to 2040 may result in overdrafting the aquifer because the projected numbers significantly exceed the 2,686 acre-feet pumped in 2011. The internal memorandum stated that "the 2011 pumping may have been above the area's safe yield." The basis of that hypothesis was not disclosed. The EIR stated that according to the 2007 Western Placer County Groundwater Management Plan the sustainable yield for the Placer County portion of the North American Groundwater Subbasin was set at 95,000 acre-feet per year. The Water Supply Assessment disclosed existing and planned future uses on the North American Subbasin during normal years, years with emergency supply issues and long-term average as follows:

**Table 5-1 – Projected Use of Groundwater Supplies**

| Groundwater | Estimated Supply (af/yr) | | | | | |
|---|---|---|---|---|---|---|
| | Current | 2020 | 2025 | 2030 | 2035 | 2040 |
| Normal Year | -- | 1,106 | 1,213 | 1,377 | 1,540 | 1,830 |
| Emergency Usage | -- | 3,687 | 4,043 | 4,588 | 5,134 | 6,100 |
| Long-Term Average | 999 | 1,229 | 1,348 | 1,529 | 1,711 | 2,033 |

We cannot conclude from the information in the EIR that the projected groundwater use for 2025 to 2040 would result in overdrafting the North American Groundwater Subbasin. We, therefore, reject Scheiber Ranch's claim that the EIR was required to disclose and analyze the significant impact of overdrafting the local basin.

Scheiber Ranch next argues that the surface water supply from the Placer County Water Agency for Specific Plan purposes was not guaranteed and the EIR did not adequately analyze projects that would compete with Lincoln for Placer County Water Agency water.

The EIR explained that historically, the Placer County Water Agency was the primary supplier of treated water to Lincoln and Lincoln would continue to primarily rely on treated surface water from the Placer County Water Agency. The EIR acknowledged that Lincoln's contract with the Placer County Water Agency did not guarantee that water to meet Lincoln buildout demand would be available. It also acknowledged that the

15

Placer County Water Agency supplied water to other users and identified those users. However, an EIR need not identify a guaranteed source of water; it is adequate for an EIR to identify existing, available and sufficient sources of water for the project. (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 909.) Here, the EIR stated that the Placer County Water Agency's 2015 Urban Water Management Plan substantiated it was likely that the Placer County Water Agency's existing water rights and contracts could meet Lincoln's buildout demand for Placer County Water Agency water. The EIR incorporated the Placer County Water Agency's 2015 Urban Water Management Plan by reference. That document is in the record and supports the statement in the EIR. The EIR reasonably relied on the Placer County Water Agency's 2015 Urban Water Management Plan. (See *San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 617, 627.) The EIR specified Placer County Water Agency available water supplies by acre-feet per year as of 2020 and by 2045 and the anticipated demands on Placer County Water Agency water by Lincoln and all other users in the same time period and showed that the available supply exceeded the anticipated demand for Placer County Water Agency water.

With regard to competing projects, the Water Supply Assessment described other projects anticipated by Lincoln and the estimated water demand from the Specific Plan and other projects. Table 5-4 of the Water Supply Assessment showed sufficient water supply to meet estimated water demand. The Placer County Water Agency's 2015 Urban Water Management Plan considered expected growth projections in its service area and estimated customer demands at buildout. As we have explained, the EIR stated that the Placer County Water Agency's available water supplies as of 2020 and by 2045 were more than sufficient to meet anticipated demands on Placer County Water Agency water, including Lincoln and all other users. Based on the above, we reject Scheiber Ranch's claims regarding the Placer County Water Agency's surface water supply.

16

Scheiber Ranch also claims the EIR incorrectly represented that the Nevada Irrigation District will supply water to the Specific Plan. But Scheiber Ranch did not raise this issue in the trial court. Points not urged in the trial court may not be raised for the first time on appeal. (*Damiani v. Albert* (1957) 48 Cal.2d 15, 18; *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804.)

III

Scheiber Ranch next argues the EIR fails to provide adequate information about fair-share mitigation to determine effectiveness. Specifically, Scheiber Ranch claims the EIR fails to provide adequate information about the fair share transportation-impact mitigation fee to determine the effectiveness of the fee.

Lincoln and Richland assert that claims about the adequacy of mitigation for automobile delay are moot because automobile delay is no longer a significant impact under CEQA. We conclude that even if Scheiber Ranch's claims are not moot, the discussion of the fair-share mitigation fee required in mitigation measures 3.15-1, 3.15-14 and 3.15-15 is adequate under CEQA, and the EIR properly concluded that impacts 3.15-4, 3.15-6, 3.15-17, 3.15-18, 3.15-19, 3.15-20 and 3.15-22 would be significant and unavoidable.

"Both the CEQA Guidelines and judicial decisions recognize that a project proponent may satisfy its duty to mitigate its own portion of a cumulative environmental impact by contributing to a regional mitigation fund. Under the Guidelines, 'a project's contribution to a significant cumulative impact' may properly be considered 'less than cumulatively considerable and thus . . . not significant' 'if the project is required to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact.' [Citation.] Similarly, courts have found fee-based mitigation programs for cumulative impacts, based on fair-share infrastructure contributions by individual projects, to constitute adequate mitigation measures under CEQA. [Citations.]" (*City of Marina v. Board of Trustees of California State University* (2006)

17

39 Cal.4th 341, 364 (*City of Marina*).) To be adequate, a fair-share mitigation fee "must be part of a reasonable plan of actual mitigation that the relevant agency commits itself to implementing." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1188 (*Anderson First Coalition*).)

The EIR used level of service to analyze traffic operations on roadway facilities. It explained, "Roadway [level of service] is a qualitative description of traffic flow from the perspective of motorists, and is an indication of the comfort and convenience associated with driving. The Highway Capacity Manual defines six levels of service from [level of service] A representing the least congested traffic conditions to [level of service] F representing the most congested traffic conditions." Impact 3.15-1 disclosed that the proposed project would increase traffic levels at six intersections under Lincoln's jurisdiction to an unacceptable level of service and that was a potentially significant impact. To address that impact, mitigation measure 3.15-1 required the project applicant to pay its fair share of the cost of specified improvements at the impacted intersections. A project applicant must construct the listed improvements if it did not make its fair-share payment.

The EIR explained that the Public Facilities Element Fee Program addressed the capital facilities required for new development, including facilities for transportation, and the cost of improvements would be funded by the collection of fees from new development on an equivalent dwelling units basis, which represented each project's share in the capital facilities needed to serve development. Project applicants pay development impact fees pursuant to Government Code section 66000 et seq. Under that statute, Lincoln must identify the public improvement that a fee will be used to finance at the time Lincoln imposes the fee on a specific development project and the fee must be used exclusively for the purpose or purposes for which it is collected. (Gov. Code, §§ 66006, 66008.) We presume that Lincoln will spend the fees collected on the

18

designated improvements.  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 141 (*Save Our Peninsula Committee*).)

The EIR stated that the improvements listed in mitigation measure 3.15-1 were included in Lincoln's updated Public Facilities Element Fee Program.  It explained that the payment of the fair share fee and construction of improvements would occur prior to the service level degrading to level of service D, as determined by a traffic study to be funded by the project applicant.  In response to comments, Lincoln further explained that it would use the following formula from the Caltrans Guide for the Preparation of Traffic Impact Studies to calculate the fair-share percentage:

$$\text{Fair Share Percentage} = \frac{\text{Project Trips}}{\text{Forecasted Traffic Volume at General Plan Buildout} - \text{Existing Traffic Volume}}$$

Based on all of the above, the fair-share-fee alternative in mitigation measure 3.15-1 is adequate mitigation under CEQA.  The fee was part of Lincoln's program to fund improvements required for new development and the improvements for mitigating the traffic impacts identified in the EIR were part of that program.  The same analysis and conclusions apply to mitigation measures 3.15-14 and 3.15-15.

*Anderson First Coalition, supra*, 130 Cal.App.4th 1173, a case on which Scheiber Ranch relies, did not hold that in all cases an EIR must state the dollar amount of a project applicant's fair-share fee.  The EIR in *Anderson First Coalition* stated that the project applicant must pay $611,214, which was 16.87 percent of the cost of Phase I of improvements to the I-5 interchange, to mitigate the proposed project's traffic impacts to the interchange.  (*Id.* at p. 1188.)  The appellate court determined that 16.87 percent of the estimated Phase I cost was $657,930, not $611,214.  (*Ibid.*)  In addition, the EIR was vague about the program that would provide the mitigating improvements.  (*Id.* at pp 1188-1189.)  Under those circumstances, the appellate court held that to be sufficient under CEQA, the mitigation fee measure "must (1) specify an amount of $657,930 . . . and note the amount is for Phase I only; (2) specify that the Project will also pay 16.87

percent of the remaining reasonable costs of the improvements; and (3) make these fees part of a reasonable, enforceable plan or program that is sufficiently tied to the actual mitigation of the traffic impacts at issue. . . ." (*Id.* at p. 1189.) Scheiber Ranch has not demonstrated that the EIR in this case contains incorrect information about the fair-share fee.

*Napa Citizens for Honest Government v. Napa County Bd. Of Supervisors* (2001) 91 Cal.App.4th 342, another case Scheiber Ranch cites, is also inapposite. Unlike the parties challenging the EIR in that case, Scheiber Ranch is not challenging an infeasibility finding. And *Napa Citizens for Honest Government* did not analyze what information must be included in the EIR's discussion of the Airport Industrial Area Mitigation Fee.

Scheiber Ranch criticizes the EIR for not providing estimated improvement costs. Mitigation measure 3.15-1 involved roadway improvements to be implemented when certain intersections operating at an acceptable level of service operate at an unacceptable level of service in the future because of project-related impacts. Scheiber Ranch does not contend that at the time of the analysis in the EIR it was reasonable to predict the date when traffic conditions at the identified intersections would require improvements to restore operations to an acceptable level. The cost estimate involved in this case is different from that in *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 196-199 (*California Clean Energy Committee*), where the fair-share payments were for the preparation of a strategic plan and implementation strategy and not a construction project, such as widening a road, to be undertaken sometime in the future.[5] The level of specificity required in an EIR is determined by the nature of the

---

[5] Moreover, the mitigation measure in *California Clean Energy Committee* did not require the lead agency to take any action. (*California Clean Energy Committee, supra*, 225 Cal.App.4th at p. 197.) In contrast, the fair-share fee here would be collected as part

project and the rule of reason. (*Center for Biological Diversity, supra*, 234 Cal.App.4th at p. 233.) Scheiber Ranch fails to convince us that mitigation measure 3.15-1 is deficient because it did not state how much improvements will cost when traffic conditions reach an unacceptable level of service in the indeterminate future. We turn next to the other traffic impact mitigation measures requiring the payment of a fair-share fee.

To address a potentially significant impact the Specific Plan would cause to traffic levels at intersections under Placer County's jurisdiction, mitigation measure 3.15-4 required project applicants to pay their fair share of improvement costs to restore vehicle traffic operations to an acceptable level of service. The EIR disclosed that there was no existing funding program for those improvements. A requirement to pay fees without any evidence that mitigation will actually occur is inadequate. (See also *City of Marina, supra*, 39 Cal.4th at p. 365; *Save Our Peninsula Committee, supra*, 87 Cal.App.4th at p. 140.) Accordingly, the EIR properly concluded that impact 3.15-4 would be significant and unavoidable. (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 938.)

An agency may determine that significant effects on the environment found to be unavoidable are acceptable due to overriding concerns. (Guidelines, § 15092; see Guidelines, § 15021, subd. (d).) Lincoln adopted a Findings of Fact and Statement of Overriding Considerations. Scheiber Ranch does not contend the Findings of Fact and Statement of Overriding Considerations document is deficient.

We reject Scheiber Ranch's claim as to mitigation measure 3.15-4. The same analysis and conclusions apply to mitigation measures 3.15-6, 3.15-17, 3.15-18, 3.15-19, 3.15-20 and 3.15-22.

_____

of Lincoln's Public Facilities Element Fee Program and the improvements identified in impact 3.15-1 were included in the Program. Lincoln had to use the fee exclusively for the purpose for which it was collected. (Gov. Code, § 66008.)

IV

Scheiber Ranch further argues the EIR impermissibly defers analysis and mitigation regarding impacts to biological resources. It claims mitigation measure 3.4-2(b), which addresses impacts on habitats of special-status species, is inadequate. Scheiber Ranch asserts that mitigation measure 3.4-2(b) fails to mitigate impacts on special-status species regulated by the California Department of Fish and Wildlife (CDFW). Although most of the arguments lack merit, we agree that mitigation measure 3.4-2(b) is inadequate because it did not provide specific performance standards for conservation sites.

As a threshold matter, we reject Lincoln and Richland's claim of forfeiture. Scheiber Ranch raised its appellate claim in the trial court.

The EIR identified a number of special-status plant and animal species with potential to occur in the Specific Plan area. It explained the following: CDFW was responsible for maintaining a list of endangered and threatened species under the California Endangered Species Act (CESA), and Fish and Game Code section 2080 provides, among other things, that a person shall not "take" plants and animals listed under CESA. "Take" is " 'any action or attempt to hunt, pursue, catch, capture, or kill any listed species.' " Take of protected species incidental to otherwise lawful management activities may be authorized under the Fish and Game Code, and authorization from CDFW would be in the form of an incidental take permit under Fish and Game Code section 2801.

The EIR acknowledged that the Specific Plan could have a substantial adverse effect on special-status species through habitat modification. Mitigation measure 3.4-2(b)(1) provided in pertinent part: "If the [Conservation Program] has not been adopted by the County and [Lincoln] and/or has not been approved by the agencies . . . [¶] . . . [t]he project applicant shall obtain a Biological Opinion and any applicable incidental take authorization from [the United States Fish and Wildlife Service] and

22

comply with the conditions and requirements therein." (Italics omitted.) Mitigation measure 3.4-2(b)(1) did not require an incidental take permit from CDFW.

However, the EIR recognized the requirement of take permits from CDFW and stated that if the Conservation Program was not adopted prior to the entitlement and buildout of the Specific Plan or prior to certain phases of the Specific Plan, project-level permitting would be required pursuant to laws and regulations, including CESA. The section on special-status plants likewise stated that take authorization may be required if take could not be avoided. Mitigation measure 3.4-4 provided that if state-listed plants were found during surveys, an incidental take permit would need to be obtained from CDFW. Mitigation measure 3.4-8, which related to potential impacts on Central Valley Steelhead and Chinook salmon, required obtaining necessary permits from CDFW. Further, in response to CDFW's concern that the Specific Plan may result in the take of state-listed species, Lincoln stated that if the Conservation Program was not adopted and approved, individual regulatory permits would be acquired. Based on the above, we reject Scheiber Ranch's challenge based on obtaining take permits from CDFW.

Scheiber Ranch also argues that bare reliance on regulatory compliance is inappropriate where the EIR fails to provide sufficient information for permitting agencies to actually exercise permitting authority. Because that claim is made in a perfunctory manner, without supporting legal analysis and citation to authority, we do not address it. (*Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1 (*Okasaki*); *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656.)

It appears that Scheiber Ranch also contends that the EIR may not rely on compliance with regulations to mitigate potential adverse environmental impacts because no surveys had been conducted in the Specific Plan area for specified plant and animal species. But CEQA does not require the completion of all possible surveys prior to the approval of a project. (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 511-512, 523-524 (*Save Panoche Valley*).) The EIR stated that

23

certain surveys had been conducted in Area A. As for the remainder of the Specific Plan area, the EIR provided a program-level analysis. When subsequent activities are proposed, Lincoln must determine whether the environmental effects of those activities were covered in the program EIR and whether additional environmental documents are required.

The authority Scheiber Ranch cites to support its contention that bare reliance on regulatory compliance is inadequate acknowledges that compliance with applicable regulatory standards may serve as adequate mitigation of environmental impacts. (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2020) § 14.15, p. 14-20.1; see Guidelines, § 15126.4, subd. (a)(1)(B).) The circumstances described in the case discussed in Kostka & Zischke are not present here. (*Id.* at p. 14-21.) The EIR did not assume that compliance with regulatory requirements would avoid significant adverse impacts on special-status species. Instead, after analyzing how the removal or modification of habitat would have a potentially significant impact on special-status species, and setting forth actions required under mitigation measure 3.4-2(b), the EIR concluded that consultation with CDFW, the United States Fish and Wildlife Service, and the U.S. Army Corps of Engineers, and the development of a city-approved, project-level mitigation plan that satisfied the requirements set forth in mitigation measure 3.4-2(b)(2), would ensure that habitat modification and potential impacts to special-status species would be mitigated to a less than significant level. Requiring consultation with a regulatory agency to formulate an adequate mitigation plan based on the conditions of the project site can be adequate mitigation. (See *Rialto, supra*, 208 Cal.App.4th at p. 944, 946-947.) And compensating for a significant environmental impact by providing substitute resources or environments, including through the permanent protection of such resources in the form of conservation easements, as provided in mitigation measure 3.4-2, can also be permissible mitigation. (Guidelines, § 15370, subd. (e).)

Scheiber Ranch urges that *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200 (*Clover Valley Foundation*) stands for the proposition that a condition requiring regulatory compliance is inadequate if a survey of the project site is not conducted before the lead agency approves the project. But *Clover Valley Foundation* did not hold that the mitigation measures for impacts on biological resources discussed in a program EIR are inadequate unless project site surveys have been completed at the time of the analysis in the EIR. (*Id.* at pp. 234-237.)

Scheiber Ranch also argues that the EIR contained no performance standards for the project-level mitigation plans and no analysis of how project-level mitigation plans would mitigate significant impacts. We find merit in this argument, and conclude that mitigation measure 3.4-2(b) is inadequate because it did not provide specific performance standards for conservation sites.

As we have explained, when an EIR identifies significant effects on the environment that would occur if a project is approved or carried out, the EIR must describe feasible measures that could minimize the significant effects. (§ 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1); see § 21081, subd. (a); Guidelines, § 15091, subd. (a).) And the public agency must mitigate or avoid the significant effects the project would have on the environment. (§ 21002.1, subd. (b); see also Guidelines, §§ 15021, subd. (a), 15126.4, subd. (a)(3).) "[W]hen, for practical reasons, mitigation measures cannot be fully formulated at the time of project approval, the lead agency may commit itself to devising them at a later time, provided the measures are required to 'satisfy specific performance criteria articulated at the time of project approval.' [Citation.] In other words, '[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan.' " (*Rialto, supra*, 208 Cal.App.4th at p. 944, italics omitted.) "[T]he public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment,

25

the agency's approval of the proposed project followed meaningful consideration of . . . mitigation measures." (*Mountain Lion Foundation v. Fish & Game Commission* (1997) 16 Cal.4th 105, 134.) We review the agency's conclusion that the mitigation measures identified in the EIR will reduce the adverse effects of the project for substantial evidence. (*Habitat & Watershed Caretakers, supra*, 213 Cal.App.4th at p. 1306.)

Mitigation measure 3.4-2(b)(2) stated that a project-level mitigation plan must implement "the open space, agricultural land and biological resources strategy." But the EIR did not describe that strategy. To the extent "the open space, agricultural land and biological resources strategy" referred to the conservation or mitigation strategy described in the section relating to the draft Conservation Program, many special-status species with potential to occur within the Specific Plan area were not among the 14 listed covered species under the draft Conservation Program. Therefore, a reader could not conclude that the strategy of the draft Conservation Program would address impacts to all special-status species within the Specific Plan area.

Moreover, the EIR did not contain any performance standards for conservation sites required under mitigation measure 3.4-2(b), i.e., standards for measuring the success of a conservation site as mitigation for the loss of habitat of special-status species with potential to occur within the Specific Plan area. (*San Joaquin Raptor Rescue Center v. County of Merced* (2017) 149 Cal.App.4th 645, 669-670 (*San Joaquin Raptor Rescue Center*) [concluding that mitigation measure requiring a qualified biologist to prepare a management plan " 'to maintain the integrity and mosaic of the vernal pool habitat' " and that regulatory agencies approve the plan merely set a generalized goal and contained no standard by which the success or failure of mitigation efforts for impacts on vernal pool species may be measured]; cf. *Rialto, supra*, 208 Cal.App.4th at pp. 942-943, [approving mitigation measure that provided for a plant salvage and transportation plan that required no less than 80 percent establishment of the plants transplanted into a receiver site]; *Clover Valley Foundation, supra*, 197 Cal.App.4th at p. 237 [performance standard was

that the project could not result in the take of black rails].)  As an example, the EIR stated that the Specific Plan area contained suitable habitat for the tricolored blackbird.  It described where this species typically nested and foraged.  Mitigation measure 3.4-2(b) did not explain how conservation sites required under a project-level mitigation plan would provide nesting and foraging habitat for the tricolored blackbird so that the Specific Plan's potential adverse impacts to such habitat would be mitigated.  The EIR did not indicate how mitigation measure 3.4-2(b) could mitigate the potential significant effects on the habitat of special-status species within the Specific Plan area.  (Cf. *Save Panoche Valley, supra*, 217 Cal.App.4th at pp. 526-528 [rejecting challenge to finding that mitigation site could reduce biological impacts where the EIR contained information that many special-status species resided in the mitigation site]; *San Joaquin Raptor Rescue Center,* at pp. 671-672 [creating new vernal pools in conservation area was proper mitigation for the project's impacts on vernal pool areas].)  The EIR also did not adopt a reporting or monitoring program.  (Guidelines, § 15091, subd. (d).)  Mitigation measure 3.4-2(b) improperly deferred the formulation of mitigation measures for potential significant adverse impacts on the habitat of special-status species.

Mitigation measure 3.4-2(b) is distinguishable from the mitigation measures examined in *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603 and *Rialto, supra*, 208 Cal.App.4th 899, cases Lincoln and Richland cite.  The mitigation measure in *California Native Plant Society* required the project applicant to prepare and implement a habitat mitigation and monitoring plan that would preserve existing habitat or create new habitat for each acre of habitat impacted by the project at specified ratios.  (*California Native Plant Society,* at p. 610.)  The plan was required to include " '[a] complete biological assessment of the existing resources on the target areas,' '[s]pecific creation and restoration plans for each target area,' and '[p]erformance standards for success that will illustrate that the compensation ratios are met.' "  (*Id.* at pp. 610-611.)  No similar requirements were included in this case.  The

27

mitigation measure in *Rialto* required the project applicant to consult with the lead agency if a particular species was observed at the project site during a series of surveys and find a way to render any impact to the species insignificant before a grading permit was issued. (*Rialto,* at pp. 944, 946-947.) The EIR here did not explain how mitigation measure 3.4-2(b) would mitigate potential significant adverse impacts to the habitat of special-status species with potential to occur within the Specific Plan site.

*Ocean Street Extension Neighborhood Association v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, a case Richland cited after briefing was completed, is also distinguishable. The mitigation measure in *Ocean Street* required a preconstruction survey if tree removal could not occur outside the breeding season for nesting avian species and provided actions to be taken to ensure that active nests were not disturbed, i.e., delaying tree removal until nests were not in use and requiring a buffer zone for construction activities. (*Id.* at pp. 850, 858.) The appellate court found such mitigation measure complied with CEQA. (*Id.* at pp. 858-859.) Mitigation measure 3.4-2(b) does not contain similar provisions. Mitigation measure 3.4-2(b) is inadequate because it did not provide specific performance standards for conservation sites.

Scheiber Ranch further argues the EIR contained no explanation of why deferral was necessary. We disagree with this claim.

The EIR explained that development under the Specific Plan would likely occur separately and at different times over a 15- to 25-year period. It provided project-level analysis for Area A (the initial phase) and program-level or "first-tier" analysis for Areas B through J. The EIR contemplated that Lincoln must determine whether the environmental effect of subsequent activities were covered in the program EIR and whether a project-specific environmental document must be prepared. The above statements explained why project-level mitigation plans could not be fully formulated at the time the EIR was prepared.

28

Scheiber Ranch complains that project-level mitigation plans would be approved by Lincoln at its sole discretion and without consultation with wildlife agencies. But the authorities Scheiber Ranch cites do not hold that CEQA requires mitigation plans to be prepared in consultation with wildlife agencies. Nevertheless, mitigation measure 3.4-2(b)(5), (b)(6) and (b)(9) incorporate approval by regulatory agencies.

Scheiber Ranch also contends that under mitigation measure 3.4-2(b)(3), Lincoln would not have the authority to deny a final map because of an inadequate project-level mitigation plan and all discretionary approvals associated with a project would have been issued by the time a project-level mitigation plan is formulated.

Approval of the Specific Plan was subject to the mitigation measures in the EIR. Mitigation measure 3.4-2(b) required a project-level mitigation plan. Mitigation measure 3.4-2(b)(3) gave Lincoln discretion to act on a proposed project-level mitigation plan. Approval of a project-level mitigation plan was not a ministerial act. In addition, Lincoln may require the project applicant to provide a conceptual plan for a project-level mitigation plan prior to approval of a tentative map. And mitigation measure 3.4-2(b) required each project to demonstrate compliance with an approved project-level mitigation plan prior to approval of a grading permit. Scheiber Ranch fails to show that the timing of the approval of a project-level mitigation plan undermines the efficacy of any approved plan.

V

Citing *Sierra Club v. County of Fresno* (2020) 57 Cal.App.5th 979, Scheiber Ranch argues the trial court erred in ordering only partial decertification of the EIR and declining to vacate the project pending Lincoln's additional CEQA review.

After the case was fully briefed, Lincoln and Richland moved to dismiss Scheiber Ranch's challenge to the scope of the trial court's peremptory writ of mandate, arguing the claim is moot because Lincoln has complied with the writ. Scheiber Ranch opposes the motion.

The peremptory writ of mandate requires Lincoln to bring its EIR into compliance with CEQA with respect to its discussion of impacts to transit facilities and reliance on the Conservation Program for impacts to biological and agricultural resources. The writ provides that the trial court would retain jurisdiction over Lincoln's proceedings until the trial court determined that Lincoln had complied with CEQA or that Lincoln had determined not to reapprove the CEQA approvals. Lincoln's supplemental return to the writ stated that Lincoln had certified a partially recirculated EIR, amending its discussion of impacts to transit facilities and mitigation for agricultural and biological impacts, and Lincoln had reapproved all project entitlements. However, Lincoln and Richland did not show that the trial court has decided the adequacy of Lincoln's return. In any event, Scheiber Ranch's timely filing of a notice of appeal from the judgment automatically stayed the peremptory writ of mandate. (Code Civ. Proc., § 916; *Citizens for Non-Toxic Pest Control v. Department of Food & Agriculture* (1986) 187 Cal.App.3d 1575, 1580; *Hayworth v. City of Oakland* (1982) 129 Cal.App.3d 723, 727-728.) The trial court lacks jurisdiction to alter the judgment while the appeal is pending. (See *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189-190, 196-198.) Accordingly, we reject the claim of mootness, deny the Lincoln and Richland motion to dismiss on that basis, and turn to Scheiber Ranch's appellate claim.

We review the trial court's interpretation of section 21168.9 de novo. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 287 (*Preserve Wild Santee*).) In *Sierra Club v. County of Fresno*, supra, 57 Cal.App.5th 979, the Fifth District Court of Appeal interpreted sections 21100 and 21151 and section 15090 of the Guidelines as not authorizing partial certification. (*Sierra Club v. County of Fresno,* at pp. 982, 987.) Sections 21100, subdivision (a) and 21151, subdivision (a) require the lead agency to certify the completion of an EIR. (*Sierra Club v. County of Fresno,* at p. 987.) Section 15090 of the Guidelines requires that prior to approving a project, the lead agency must certify that a final EIR has been completed in compliance with CEQA. (*Sierra Club v.*

30

*County of Fresno,* at p. 987.) The Fifth District Court of Appeal held: "CEQA and the 'Guidelines provide for the certification of an EIR when it is complete, and the concept of completeness is not compatible with partial certification. In short, an EIR is either complete or it is not.' " (*Id.* at p. 988 [quoting its prior decision, *LandValue 77, LLC v. Board of Trustees of California State University* (2011) 193 Cal.App.4th 675, 682 (*LandValue 77, LLC*)].) The Court of Appeal also said an EIR is either completed in compliance with CEQA or it is not. (*Sierra Club v. County of Fresno,* at p. 982.) It acknowledged case law questioning its interpretation of CEQA and the Guidelines but said those decisions did not analyze language in sections 21100 or 21151 and section 15090 of the Guidelines. (*Sierra Club v. County of Fresno,* at p. 989.) It further held that even if CEQA is interpreted to allow for partial certification, such a remedy was inappropriate in that case because the CEQA violations tainted the certification of the EIR as a whole. (*Id.* at p. 982.) In other words, the circumstances in that case did not permit severance findings under section 21168.69, subdivision (b). (*Sierra Club v. County of Fresno,* at p. 982.)

The majority of the Courts of Appeal have interpreted section 21168.9 differently. The Second District Court of Appeal in *Center for Biological Diversity v. Department of Fish & Wildlife* (2017) 17 Cal.App.5th 1245 held that CEQA permits partial decertification. The appellate court said "an agency *initially* must certify an entire EIR before approving a project. [Citations.] However, a court has additional options once it has found an agency's EIR certification noncompliant. (*Id.* at p. 1252, original italics.) Section 21168.9 governs the writ of mandate that a court issues after 'trial, hearing, or remand from an appellate court' to remedy a CEQA violation." (*Center for Biological Diversity v. Department of Fish & Wildlife,* at p. 1252.) The appellate court held that section 21168.9, subdivision (a) authorizes a court to void the agency's determination, including an EIR certification, "in whole or in part" if the court makes severance findings pursuant to section 21168.9, subdivision (b) to determine whether the voided portions are

31

severable and whether the remainder will be in full compliance with CEQA. (*Center for Biological Diversity v. Department of Fish & Wildlife,* at pp. 1252-1253.) The appellate court distinguished *LandValue 77, LLC, supra*, 193 Cal.App.4th 675, as involving a situation where the trial court did not properly make severance findings under section 21168.9, subdivision (b). (*Center for Biological Diversity v. Department of Fish & Wildlife, supra,* at p. 1254.)

The Fourth District Court of Appeal in *Preserve Wild Santee, supra*, 210 Cal.App.4th 260, likewise held that "a reasonable, commonsense reading of section 21168.9 plainly forecloses plaintiffs' assertion that a trial court must mandate a public agency decertify the EIR and void all related project approvals in every instance where the court finds an EIR violates CEQA. Such a rigid requirement directly conflicts with the 'in part' language in section 21168.9, subdivision (a)(1), which specifically allows a court to direct its mandates to parts of determinations, parts of findings, or parts of decisions. Such a rigid requirement also conflicts with the language in section 21168.9, subdivision (b), limiting the court's mandates to only those necessary to achieve CEQA compliance and, if the court makes specified findings, to only 'that portion of a determination, finding, or decision' violating CEQA." (*Id.* at p. 288, italics omitted; see *Golden Gate Land Holdings LLC v. East Bay Regional Park Dist*. (2013) 215 Cal.App.4th 353, 373-376; see also *Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 205 (*Central Delta Water Agency*) [stating that "[t]he plain language of section 21168.9 grants the trial court the discretion to leave project approvals in place"]; *Anderson First Coalition, supra*, 130 Cal.App.4th at pp. 1178-1181 [concluding that section 21168.9 authorized the trial court to sever the gas station portion of a project and allow the rest of the project to proceed where the defects in the EIR related only to the proposed gas station].)

We agree with the analyses in *Center for Biological Diversity v. Department of Fish & Wildlife* and in *Preserve Wild Santee*. "Section 21168.9 was enacted in 1984 to

32

give the trial courts some flexibility in tailoring a remedy to fit a specific CEQA violation." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097, 1103.) That statute sets forth the remedies a trial court may grant if it finds that a determination by a public agency does not comply with CEQA. (§ 21168.9, subd. (a); *San Bernardino Valley Audubon Soc.,* at pp. 1102-1103.) Among other things, the trial court may enter an order that the agency's determination be voided "in whole or in part." (§ 21168.9, subd. (a); Guidelines, § 15234, subd. (a).) The phrase "in whole or in part" "raise[s] the possibility of severing some part of the approvals and the project from other parts and then invalidating or suspending only the severed parts." (*POET, LLC v. State Air Resources Bd.* (2017) 12 Cal.App.5th 52, 91 (*POET, LLC*); accord *King & Gardiner Farms, LLC, supra*, 45 Cal.App.5th at pp. 895-896 [stating that section 21168.9 requires courts to consider severance].)

The trial court's order must include only those mandates that are necessary to achieve compliance with CEQA and only those specific project activities in noncompliance with CEQA. (§ 21168.9, subd. (b).) Further, the order shall be limited to that portion of a determination, finding or decision or the specific project activity or activities found to be in noncompliance if the court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with CEQA, and (3) the court has not found the remainder of the project to be in noncompliance with CEQA. (§ 21168.9, subd. (b); see Guidelines, § 15234, subd. (b).) An agency may proceed with a project or individual project activities during the remand period where the court has exercised its equitable discretion to permit project activities to proceed during that period. (Guidelines, § 15234, subd. (c).)

The above provisions in section 21168.9 and section 15234 of the Guidelines indicate that a court may order partial decertification of an EIR so long as the severability criteria in subdivision (b) of section 21168.9 are satisfied. Although CEQA requires that an EIR be completed before an agency makes a decision on a project, section 21168.9

33

governs the judicial remedies for a CEQA violation and section 21168.9 authorizes a trial court to void an agency's EIR certification in part upon making the requisite severance findings. (*Central Delta Water Agency, supra*, 69 Cal.App.5th at p. 205; *Center for Biological Diversity v. Department of Fish & Wildlife, supra*, 17 Cal.App.5th at pp. 1252-1254; *Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 288; see also *POET, LLC, supra*, 12 Cal.App.5th at pp. 91-92.) To the extent sections 21100 and 21151 conflict with section 21168.9, the latter, being specific as to judicial remedies for CEQA violations, controls. (*San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577.) Scheiber Ranch fails to establish that the trial court erred in issuing a limited writ after it made severance findings.

VI

Turning to the trial court's ruling on the demurrer, Scheiber Ranch contends it asserted a cognizable substantive due process claim.

A demurrer tests the legal sufficiency of the challenged pleading. (*Milligan v. Golden Gate Bridge Highway & Transportation Dist*. (2004) 120 Cal.App.4th 1, 5.) We independently evaluate the pleading, construing it liberally, giving it a reasonable interpretation, reading it as a whole, and viewing its parts in context. (*Id.* at pp. 5-6.) We assume the truth of all material facts properly pleaded or implied, but we do not assume the truth of contentions, deductions or conclusions of law. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081; *Aubry v. Tri-City Hospital Dist*. (1992) 2 Cal.4th 962, 966-967.) Viewing matters through this prism, we determine de novo whether the factual allegations of the challenged pleading are adequate to state a cause of action under any legal theory. (*Milligan,* at p. 6.) The appellant bears the burden of demonstrating that the demurrer was sustained erroneously. (*Friends of Shingle Springs Interchange, Inc. v. County of El Dorado* (2011) 200 Cal.App.4th 1470, 1485.)

The second cause of action asserted deprivation of substantive due process. It alleged the following: Scheiber Ranch possessed a constitutionally-protected property

34

right based on its ownership of real property in Placer County. The Specific Plan designated 101 acres of Scheiber Ranch's property as Open Space Preserve and prohibited all urban development on Preserve areas. Lincoln deprived Scheiber Ranch of its constitutional and/or statutory rights by arbitrarily, unreasonably and oppressively precluding future development rights. The trial court sustained the demurrer to the substantive due process cause of action without leave to amend, concluding that Scheiber Ranch did not allege facts showing that it had a vested property interest in developing its property in the future and failed to show that it could amend its writ petition to state a cause of action.

The due process clauses of the state and federal Constitutions guarantee all persons due process of law when the state deprives them of their property. (Cal. Const., art. I, § 7; U.S. Const., 14th Amend., § 1.) A party asserting a substantive due process claim must first establish a valid property interest within the protection of the Constitution. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1184 (*Clark*); *Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 181.) In the context of land use and zoning decisions, a property interest is a right to land use to which the plaintiff is entitled. (*Breneric Associates,* at pp. 181, 183-184.) "If a cognizable property interest is implicated, a court must then determine whether the government's action was arbitrary or irrational." (*Clark,* at p. 1184.)

The second cause of action alleged that Lincoln deprived Scheiber Ranch of its property right to future development by designating a portion of its land as open space. However, landowners do not have a vested right in an existing or future land use plan, designation, or zoning classification. (*HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 512, fn. 2; *Save Oxnard Shores v. California Coastal Commission* (1986) 179 Cal.App.3d 140, 151; *Gilliland v. County of Los Angeles* (1981) 126 Cal.App.3d 610, 617; *Dale v. City of Mountain View* (1976) 55 Cal.App.3d 101, 110; *Morse v. San Luis Obispo County* (1967) 247 Cal.App.2d 600, 602; see also *Anderson v. City Council of Pleasant Hill*

(1964) 229 Cal.App.2d 79, 90.)  Because Scheiber Ranch failed to allege facts showing that it had a protectible interest in not having its property designated as open space, it failed to state a cause of action for a substantive due process violation and we need not determine whether the pleading sufficiently alleged that Lincoln deliberately flouted the law.  (See *Clark, supra,* 48 Cal.App.4th at p. 1184; see generally *Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1034-1036, 1039-1040.)  The cases Scheiber Ranch cites in support of its claim that it had a protectible property interest -- *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175 (*Jefferson Street Ventures, LLC*) and *Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256 -- involve whether development restrictions constituted an unconstitutional taking without just compensation and not whether a protectible property interest within the meaning of the due process clauses existed.  Because we conclude Scheiber Ranch failed to allege a property interest within the protection of the due process clauses and, therefore, did not state a cause of action for deprivation of substantive due process, we do not consider the claim in Richland's cross-appeal that the substantive due process cause of action was also time-barred.

Scheiber Ranch further asserts that if it failed to state a cause of action for deprivation of substantive due process, it should be granted leave to amend.

We review a trial court's decision to deny leave to amend for abuse of discretion. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  If the challenged pleading could be amended to state a cause of action, the trial court abused its discretion in denying leave to amend and we will reverse.  (*Ibid.*)  "It is the plaintiff's burden on appeal to show in what manner it would be possible to amend a complaint to change the legal effect of the pleading; we otherwise presume the pleading has stated its allegations as favorably as possible."  (*Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 962.) "To meet this burden, a plaintiff must submit a proposed amended complaint or, on appeal, enumerate the facts and demonstrate how those facts establish a cause of action.

36

[Citations.]  Absent such a showing, the appellate court cannot assess whether or not the trial court abused its discretion by denying leave to amend."  (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 890.)  An assertion of an abstract right to amend is not enough.  (*Hambrick v. Healthcare Partners Medical Group, Inc.* (2015) 238 Cal.App.4th 124, 163.)

Scheiber Ranch does not show how it can amend its pleading to allege that it has a constitutionally-protected property interest.  It fails to explain how authorities relating to standing demonstrate that it can state a substantive due process claim.  Accordingly, we reject its claim of trial court error.

VII

Scheiber Ranch next contends the trial court erred in sustaining without leave to amend the demurrer to the uncompensated taking cause of action on statute of limitations grounds.  Scheiber Ranch argues its taking cause of action was timely based on delayed discovery and fraudulent concealment.

Government Code section 65009 governs the statute of limitations for actions or proceedings challenging local zoning and planning decisions.  "In enacting the statute, the Legislature found and declared 'that there currently is a housing crisis in California and it is essential to reduce delays and restraints upon expeditiously completing housing projects.'  [Citation.]  It further found and declared that legal actions challenging 'the implementation of general plan goals and policies that provide incentives for affordable housing, open-space and recreational opportunities, and other related public benefits, can prevent the completion of needed developments even though the projects have received required government approvals.'  [Citation.]  The Legislature expressly intended Government Code section 65009 'to provide certainty for property owners and local governments regarding decisions made pursuant to [the Planning and Zoning Law (Gov. Code, § 65000 et seq.)].'  [Citation.]  'To this end, Government Code section 65009, subdivision (c) establishes a short, 90-day statute of limitations . . .  to a broad range of

37

local zoning and planning decisions.' " (*1305 Ingraham, LLC v. City of Los Angeles* (2019) 32 Cal.App.5th 1253, 1260.) The statute requires strict compliance with the limitations period. (*Okasaki, supra*, 203 Cal.App.4th at p. 1048.) Except in circumstances inapplicable here, an action or proceeding to attack, review, set aside, void or annul the decision of a legislative body to adopt or amend a specific plan must be commenced within 90 days after the legislative body's decision. (Gov. Code, § 65009, subd. (c)(1)(A).) Any further action or proceeding is barred upon the expiration of the time limits provided in Government Code section 65009. (Gov. Code, § 65009, subd. (e).)

Scheiber Ranch does not dispute that Government Code section 65009, subdivision (c)(1)(A) applies and that Scheiber Ranch did not bring its taking claim within the 90-day limitations period. Instead, Scheiber Ranch argues the accrual of the taking cause of action was postponed by the discovery rule and that the limitations period was tolled by the fraudulent concealment rule. We turn first to the application of the delayed discovery rule.

Generally, a cause of action accrues when the wrongful act is done, or the wrongful result occurs, and the consequent liability arises. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 (*Norgart*).) The delayed discovery rule is an exception to the general rule. (*Ibid.*) The delayed discovery rule postpones accrual of a cause of action until the plaintiff discovers or has reason to discover the cause of action. (*Ibid.*) A plaintiff discovers the cause of action when he or she at least suspects a factual basis, as opposed to a legal theory, for its elements. (*Ibid.*) A plaintiff has reason to discover the cause of action when he or she has notice or information of circumstances that would put a reasonable person on inquiry. (*Id*. at p. 398) The plaintiff bears the burden of pleading and proving belated discovery of a cause of action or fraudulent concealment as an excuse for late filing. (*Czajkowski v. Haskell & White, LLP* (2012) 208 Cal.App.4th 166, 174; *Investors Equity Life Holding Co. v. Schmidt* (2011) 195 Cal.App.4th 1519, 1533.)

38

The delayed discovery rule may be expressed by the Legislature or implied by the courts.  (*Norgart, supra*, 21 Cal.4th at p. 397.)  Government Code section 65009 does not expressly provide for delayed discovery.  But even if we assume the delayed discovery rule may be applied to postpone the accrual of a cause of action governed by Government Code section 65009, subdivision (c)(1), here Scheiber Ranch does not demonstrate trial court error.

The state and federal Constitutions guarantee real property owners just compensation when the government takes their property for a public use.  (*Jefferson Street Ventures, LLC, supra*, 236 Cal.App.4th at p. 1192.)  A plaintiff seeking to challenge a government regulation as an uncompensated taking may proceed under several theories.  (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 548 [161 L.Ed.2d 876].)  The paradigmatic taking requiring just compensation is a direct government appropriation or physical occupation of or ouster from private property.  (*Id.* at p. 537.)  In addition, some government regulation of private property is deemed a per se taking for Fifth Amendment purposes.  (*Id.* at pp. 537-538.)  Included in that category are regulations that deprive an owner of all economically beneficial use of its property.  (*Id.* at p. 538.)  Under the state Constitution, property is taken or damaged, requiring just compensation, when " '(1) the property has been physically invaded in a tangible manner; (2) no physical invasion has occurred, but the property has been physically damaged; or (3) an intangible intrusion onto the property has occurred which has caused no damage to the property but places a burden on the property that is direct, substantial, and peculiar to the property itself.' " (*Boxer v. City of Beverly Hills* (2016) 246 Cal.App.4th 1212, 1218, italics omitted.)

The second amended writ petition and complaint alleged a physical taking:  under the Specific Plan, Lincoln would construct a fence that would exclude Scheiber Ranch from its own property.  Scheiber Ranch also alleged that the Specific Plan's expansive Open Space Preserve designation on Scheiber Ranch property denied Scheiber Ranch all

39

right to develop its property.  The allegations of taking were based on provisions of the Specific Plan and the effect of those provisions on Scheiber Ranch's property.

The allegations of the pleading showed that Scheiber Ranch was aware of the Open Space Preserve designation on its property when it submitted a written comment regarding the draft EIR.  That comment was dated October 10, 2016.  The original writ petition referenced "the Specific Plan documents" and alleged that Lincoln approved the Specific Plan on December 12, 2017.  The above allegations indicate Scheiber Ranch discovered or had reason to discover its cause of action for uncompensated taking in 2016 or 2017.  On January 12, 2018, it filed its writ petition, but Scheiber Ranch did not bring a cause of action for uncompensated taking until November 7, 2019, well beyond the 90-day limitations period.

Scheiber Ranch concedes it was aware that the Specific Plan included open space designations on its property.  Nevertheless, it claims the only information available to Scheiber Ranch was that the restriction on development was based on the Conservation Program (not the Specific Plan) and the public release of the Conservation Program in 2019 revealed that the Conservation Program did not restrict development.  However, the second amended writ petition and complaint alleged takings based on provisions in the Specific Plan and not the draft or final Conservation Program.  Scheiber Ranch does not assert belated discovery of the provisions of the Specific Plan.  Scheiber Ranch fails to establish it could plead facts showing that its cause of action for uncompensated taking was not time-barred under the delayed discovery rule.

Turning to the rule of fraudulent concealment, " 'the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it.' [Citation.]  Like the discovery rule, the rule of fraudulent concealment is an equitable principle designed to effect substantial justice between the parties; its rationale 'is that the

40

culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an "otherwise diligent" plaintiff in discovering his cause of action.' " (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931.)  The plaintiff must show the substantive elements of fraud and an excuse for late discovery of the facts. (*Britton v. Girardi* (2015) 235 Cal.App.4th 721, 734.)

The second amended writ petition and complaint did not allege any fraud by Lincoln that prevented Scheiber Ranch from discovering its cause of action for uncompensated taking.  Rather, the allegations in the pleading show that Scheiber Ranch was aware of the Specific Plan and the open space designation for its property prior to January 12, 2018.  Scheiber Ranch fails to show how it can amend its pleading to allege that the rule of fraudulent concealment tolled the Government Code section 65009 limitations period for its taking claim.  Under the circumstances, we do not consider the claim in Richland's cross-appeal that Scheiber Ranch cannot allege facts sufficient to state a claim for an unconstitutional taking in violation of the Fifth Amendment.

RICHLAND'S CROSS-APPEAL

VIII

In its cross-appeal, Richland contends the Scheiber Ranch challenge to mitigation measure 3.2-1 is moot because Placer County has adopted the Conservation Program.

"[M]ootness occurs when an actual controversy that once was ripe no longer exists due to a change in circumstances."  (*Davis v. Fresno Unified School District* (2020) 57 Cal.App.5th 911, 926; accord *Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1221-1224.)  The test for determining whether a case is moot is whether the trial court can grant the plaintiff any effectual relief.  (*Davis,* at p. 926.)

The second amended petition for writ of mandate and complaint alleged that the EIR did not comply with CEQA because it improperly deferred formulation of mitigation measures inasmuch as it relied on a draft Conservation Program to mitigate for impacts to

41

biological and agricultural resources.  That Placer County approved a final Conservation Program in 2020 is irrelevant to our analysis whether the EIR certified in 2017 provided sufficient information to allow government officials and the public to make an informed decision.  We deny Richland's motion for judicial notice filed on March 29, 2021, for that reason.  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1; *State of California ex rel. Metz v. Farmers Group, Inc.* (2007) 156 Cal.App.4th 1063, 1071, fn. 7.)  Whether the EIR was sufficient as an informational document is not rendered moot by the approval of the final Conservation Program.

*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, the case Richland cites, is distinguishable.  There was no change in the law that renders Scheiber Ranch's deferred mitigation claim moot.  (*Id.* at pp. 625-626.)

IX

Richland also argues the trial court erred in concluding that the formulation of certain mitigation measures based on compliance with the Conservation Program were improperly deferred.

As we have explained, deferring the formulation of the details of a mitigation measure is permitted when the agency adopts specific performance standards the mitigation will achieve, commits itself to mitigation, and identifies the types of potential actions that can feasibly achieve the performance standards.  (Guidance, § 15126.4, subd. (a)(1)(B); *Center for Biological Diversity, supra*, 234 Cal.App.4th at pp. 244-245; *Rialto, supra*, 208 Cal.App.4th at pp. 944-945.)  Whether an EIR's discussion of mitigation measures is sufficient to comply with CEQA presents a mixed question of law and fact and is generally subject to independent review.  (*King & Gardiner Farms, LLC, supra*, 45 Cal.App.5th at p. 866; see also *Sierra Club, supra*, 6 Cal.5th at p. 516; *Vineyard, supra*, 40 Cal.4th at p. 435.)  However, when factual questions predominate, review under the more deferential substantial evidence standard is warranted.  (*Laurel*

42

*Heights Improvement Assn., supra*, 47 Cal.3d at p. 407; *King & Gardiner Farms, LLC,* at p. 866; see also *Vineyard,* at p. 435.)

Mitigation measures 3.2-1, 3.4-1 and 3.4-2 provided that the project applicant must comply with the Conservation Program in order to mitigate impacts to agricultural and biological resources if the Conservation Program is adopted and approved. The EIR stated that compliance with the Conservation Program would mitigate, partially or otherwise, the Specific Plan's potential significant impacts on agricultural and biological resources. But the EIR did not set forth performance criteria for the final Conservation Program. Richland fails to show why Lincoln could not set forth standards the final Conservation Program had to satisfy to mitigate the Specific Plan's agricultural and biological resource impacts.

The EIR stated, "A key component of the conservation strategy is based on land cover mitigation. In addition to wetland mitigation, impacts to specific land cover types (e.g., annual grassland, agriculture, etc.) would be tracked, and in-kind mitigation would occur at ratios of 1:1.25, 1:1.35 or 1.5, depending on the land cover." Mitigation measures must be able to reduce the potential significant environment impact. (*Gray, supra*, 167 Cal.App.4th at p. 1119.) But there is no explanation in the EIR how the land cover mitigation required under the Conservation Program would mitigate the potential significant impacts to agricultural and biological resources identified in the EIR.

Moreover, at the time of the analysis in the EIR, the Conservation Program was in draft form only, had not been reviewed under CEQA, and had not been considered for adoption by Placer County or state and federal regulatory agencies. " 'An EIR is inadequate if "[t]he success or failure of mitigation efforts . . . may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR." ' " (*Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 281; see also *Vineyard, supra*, 40 Cal.4th at pp. 440-441 [holding that it was improper to tier impacts analysis in an EIR on a future environmental document];

43

*California Clean Energy Committee, supra*, 225 Cal.App.4th at pp. 195-196; *San Joaquin Raptor Rescue Center, supra*, 149 Cal.App.4th at p. 670.) We conclude that the discussion of mitigation measures based on compliance with a yet-to-be reviewed and approved Conservation Program is inadequate.

Richland contends it is well settled that compliance with regulatory standards is adequate mitigation under CEQA. Citing what appears to be the March 2016 draft Conservation Program, Richland says the Conservation Program must satisfy various statutory and regulatory standards. Although what appears to be a draft Conservation Program is in the record before us, Richland fails to show, and we have not found, that the draft Conservation Program was included as part of the draft or final EIR. Lincoln could not have incorporated the draft Conservation Program into the EIR by reference because, as the draft EIR acknowledged, the draft Conservation Program was not publicly available. (Guidelines, § 15150, subd. (b).) An agency fails to proceed in the manner provided in CEQA if it certifies an EIR based on information not actually incorporated or described in the EIR. (See *Vineyard, supra*, 40 Cal.4th at p. 442.) Unlike in *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 907-910, a case Richland cites, the EIR did not describe statutory or regulatory standards the Conservation Program must satisfy. "An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn., supra*, 47 Cal.3d at p. 405.) That the lead agency had considered an issue and made certain conclusions does not obviate the need for the EIR to discuss a mitigation measure so that the public may be equally informed. (See *Id.* at pp. 404-405.) Richland fails to demonstrate trial court error.

X

Richland further challenges the trial court's ruling that the EIR's analysis of transit impacts violated CEQA. According to Richland, the EIR applied significance criteria for

44

transit impacts and explained why impacts will be less than significant. Richland argues substantial evidence supported the less-than-significant-impact conclusion, and nothing more was required.

A lead agency is responsible for considering the effects, both individual and collective, of all activities involved in a project. (§ 21002.1, subd. (d).) It "bears a burden to investigate potential environmental impacts." (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1597.) "While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.) If a project is of regional or areawide significance, the lead agency must consult with transportation planning agencies and public agencies that have transportation facilities within their jurisdictions that could be affected by the project. (§ 21092.4, subd. (a).) "Transportation facilities" include public transit within five miles of the project site and rail transit service within 10 miles of the project site. (§ 21092.4, subd. (b).) Consultation shall be for the purpose of the lead agency obtaining information concerning the project's effect on public transit and rail transit service within the jurisdiction of the transportation planning agency or the public agency that is consulted by the lead agency. (§ 21092.4, subd. (a).) If the lead agency determines that the proposed project will not have a potentially significant adverse effect on the environment, the EIR must contain a statement briefly indicating the reasons for the determination. (§ 21100, subd. (c).) We review the agency's determination that the project will not have a significant adverse impact for substantial evidence. (*San Francisco Baykeeper, Inc. v. State Lands Commission* (2015) 242 Cal.App.4th 202, 228.)

The EIR described the public transit services in Lincoln, including the Lincoln Transit Dial-A-Ride and Placer County Transit. It stated there was no existing transit service in the Specific Plan area and no transit stops were located in the vicinity of the project site, but that Lincoln and Placer County might provide transit service to the area

45

in the future.  The EIR did not state whether there was public transit service within five miles or rail transit service within 10 miles of the Specific Plan site.

The EIR indicated that impacts to the transit system would be considered significant if the Specific Plan would create a demand for mass transit services above the capacity which was provided or planned or would interfere with existing or planned transit facilities.  Richland states in its appellate brief that existing transit serving Lincoln stopped once per hour during the day, and the Developing Communities designation for the Specific Plan area meant that transit options were infrequent or non-existent, but that transit service may be available every 30 minutes or less at buildout.  The EIR concluded that the Specific Plan's impact on transit was less than significant.  But the EIR did not discuss whether the creation of approximately 8,200 residential dwelling units, 4.6 million square feet of commercial space, and the public/semipublic facilities contemplated under the Specific Plan, or the potential of having transit service in the Specific Plan area available every 30 minutes or less, would create a demand for transit services that would exceed the existing or future capacity for those services.  Nor did the EIR provide any analysis supporting a conclusion that the Specific Plan's impacts on transit services would be less than significant.  The decision as to whether a project may have one or more significant effects must be based on substantial evidence in the record of the lead agency.  (Guidelines, § 15064, subd. (f).)  Richland fails to point to any portion of the record containing substantial evidence showing that the Specific Plan would have a less-than-significant impact on transit services.  A bare conclusion that the Specific Plan would have a less than significant impact on transit is inadequate under CEQA.  (See § 21168.5; *Californians for Alternatives to Toxics v. Department of Food & Agriculture* (2005) 136 Cal.App.4th 1, 13.)

The EIR's discussion of impacts on transit focused on the construction of transit facilities.  The EIR stated that the project would include facilities, such as bus stops, bus turnouts, bus shelters, and park-and-ride lots, which would be used in the event public

transit service providers extended service to the Plan Area. A bus transfer lot was being considered as part of a joint use park-and-ride lot to support transit use. Impact 3.15-11 said the facilities that would be provided under the Specific Plan were adequate to support future transit demand and the expansion of transit service to the project area, but there was no discussion of what future transit demand and service would be, and therefore, no basis for determining whether the facilities provided under the Specific Plan would be adequate to support the future demand and service. Although the EIR concluded that the Specific Plan did not interfere with existing or planned transit facilities, there was an inadequate description of those existing or planned transit facilities.

Placer County Principal Planner Crystal Jacobsen commented that the draft EIR did not include a transit service plan, which was "a vital element to a mobility package," and the Specific Plan documents did not mention future transit to the Specific Plan area. She asked whether Lincoln had a transit plan to cover the Specific Plan area. Lincoln responded that buildout of the project would occur in phases over an extended period of time and transit service to the area would evolve as development occurred. Lincoln said transit service planning for the project area was most appropriately conducted as each phase of development occurred to reflect travel and land development conditions at that time and that planning would be carried out during the tentative map stage for each project phase. However, Lincoln did not set forth any performance criteria for future transit service planning to mitigate transit impacts nor commit itself to mitigation. (See *Rialto, supra*, 208 Cal.App.4th at pp. 944-945.) Richland fails to demonstrate that the EIR's discussion of transit impacts complied with CEQA.

## DISPOSITION

The judgment with regard to mitigation measure 3.4-2(b) is reversed. The judgment is affirmed in all other respects. The matter is remanded to the trial court with directions to determine whether severance is proper as to mitigation measure 3.4-2(b) and

47

enter a judgment and issue a writ of mandate consistent with this opinion. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

                                                            /S/

                                                   MAURO, Acting P. J.

We concur:

     /S/

DUARTE, J.

     /S/

HOCH, J.